**POOL et al. v. SNEED et al.**

No. 5531.

Court of Civil Appeals of Texas. Amarillo.

June 7, 1943.

Adkins, Pipkin, Madden & Keffer, of Amarillo, Samuels, Foster, Brown & Mc-Gee, of Fort Worth, Chrestman, Brundidge, Fountain, Elliott & Bateman, of Dallas, A. J. Lewis and John Watson, both of Camer-

on, and Black, Graves & Stayton, of Austin, for appellants.

Camp & Camp and J. W. Garner, all of Rockdale, Irby Dunklin, of Fort Worth, O. L. Kidd and E. A. Wallace, both of Cameron, Ben P. Monning, of Amarillo, and Julian B. Mastin, of Dallas, for appellees.

FOLLEY, Justice.

This suit involves chiefly the construction of the will of J. T. Sneed, Sr., who died at his home in Georgetown on March 12, 1912, having theretofore, on December 24, 1909, executed his holographic will. He was twice married and left surviving him his second wife, Lillian Beal Sneed, and six children. Four of the children were of the first marriage and the other two were of the second marriage. The children of the first marriage were J. T. Sneed, Jr., J. B. Sneed, Georgie Sneed Thompson, and H. M. Sneed. The children of the second marriage were Lillian Bond Sneed and James Phillip Sneed.

At the time of his death J. T. Sneed, Sr., owned extensive real estate holdings in Moore, Falls, Milam, and other Texas counties. The Moore County property consisted of an undivided one-half interest in a ranch of about 75,424 acres. The other half interest in such ranch was owned by his son, J. T. Sneed, Jr. A very small portion of this ranch then extended over into Potter County but by exchange of properties after the testator's death, as will hereinafter appear, the Potter County land was exchanged for other land situated wholly in Moore County; hence, we refer to such ranch as the Moore County ranch.

In the first section of the will of J. T. Sneed, Sr., he stated that he had already set apart to the four children of his first marriage their one half of the community estate of himself and their deceased mother, who was a sister of his second wife. He thereafter made certain specific devises of lands in Falls County to the two younger children, Lillian Bond Sneed and James Phillip Sneed, and stated that this was made "in order to place them on an equality with my older children." He next set apart a family burial lot and church lot for the use and benefit of the Methodist Episcopal Church South. He then made a devise and bequest, the interpretation of which affords the chief controversy in this suit. It was as follows: "Third: After this above distribution as above set fourth

I will, and bequeath that all of my property of every kind wherever situated or found shall be equally divided share and share alike, between my wife, Lillian B. Sneed, J. T. Sneed, Jr., J. B. Sneed, George E. Thompson, H. M. Sneed, Lillian Bond Sneed, and James Phillip Sneed, their heirs or assigns, but in case any of the above named persons and heirs should die without issue or assigns, then in that event his or her *potion* of my estate shall be divided among and between the other surviving and named heirs share and share alike."

The will contained the further provision that he desired his ranch property in Moore County, owned jointly by him and his son, J. T. Sneed, Jr., to remain undivided "until it suits my wife, Lillian B. Sneed, and my son, J. T. Sneed, Jr., not to exceed ten years, and during said period of ten years if my wife and son above mentioned so desire to hold said Ranch property undivided or partitioned, my wife, Lillian B. Sneed, shall have the use and benefit of the net proceeds derived from said property if she so wishes and desires, * * *." The will further provided that should it become necessary to sell property to pay any debts or burial expenses or make division and partition of his estate, "at my decease, my hereinafter named executrix and executors shall have full power and legal right under and by this will to execute good and sufficient deeds or any other form of conveyances that becomes necessary without recourse to the Courts." Under the will, Mrs. Lillian Beal Sneed was appointed executrix, and J. T. Sneed, Jr., J. B. Sneed, and H. M. Sneed were appointed executors.

When the testator died in 1912, the above-named seven devisees survived him. At that time Mrs. Georgie Sneed Thompson (George E. Thompson in the will) resided with her husband, Terry Thompson, in Amarillo; J. T. Sneed, Jr., lived in Amarillo; J. B. Sneed resided in Dallas; H. M. Sneed lived near Calvert; and the widow, Mrs Lillian Beal Sneed, and her two children, Lillian Bond Sneed and James Phillip Sneed, resided in Georgetown at the old family home in Williamson County where the testator resided at the time of his death.

The will of J. T. Sneed, Sr., was duly probated in 1912 in Williamson County. The testimony shows that prior thereto the beneficiaries under the will had been en-

deavoring to agree upon a partition of their interests so that they might acquire in severalty lands near where they each lived. By prearrangement, they fixed July 2, 1912, the day the will was probated, as the time they would meet and attempt a voluntary partition of the estate. All of the beneficiaries except Mrs. Georgie Thompson met at Georgetown for such purpose on the day appointed. Mrs. Thompson had theretofore authorized her brothers to act for her in the partition. The issue as to the partition agreement was controverted by the appellants, but the jury, upon sufficient testimony, resolved the issue in favor of the appellees. It is thus established that at the meeting of July 2, 1912, an oral partition agreement was made between J. T. Sneed, Jr., H. M. Sneed, and J. B. Sneed, and a tentative agreement was made between Mrs. Thompson, Mrs. Lillian Beal Sneed, and Lillian Bond Sneed, which was later confirmed by Mrs. Thompson, to partition the lands in keeping with their joint desires. It was decided that James Phillip Sneed, who was still a minor, would keep his joint undivided interest in the entire estate. The agreement between the brothers and that between the mother and the daughters were identical in principle, resulting in J. T. Sneed, Jr. and Mrs. Thompson acquiring their entire severalty interests in Moore County in the Panhandle of Texas, and the other adult devisees acquiring their shares in Falls and Milam Counties in central Texas. After this oral partition, it appears that the respective parties recognized it as effective from that date; however, it was almost a year before all of the various deeds of conveyance effectuating the partition were exchanged between them. As material here, a 2/14 interest in the Moore County property was acquired by J. T. Sneed, Jr. in the partition, which was in addition to the 1/14 interest he had received under his father's will and the 1/2 interest he owned independently in his own right, the latter interest not being involved in this suit in any particular. The partition thus resulted in his having acquired a 3/14 interest in the land under his father's will. The deed under which he received the 2/14 interest in the land was executed by J. B. Sneed on June 9, 1913, and recited a cash consideration of $50,000. J. B. Sneed had theretofore, under the partition agreement, acquired the 1/14 interest of H. M. Sneed in the Moore County lands under a deed dated January 2, 1913, which recited a cash

consideration of $24,500. Mrs. Lillian Beal Sneed, on January 28, 1913, executed her deed for a 1/14 interest in the Moore County lands in favor of Mrs. Georgie Sneed Thompson for a recited cash consideration of $25,000. On June 9, 1913, the same date that the deed was executed by J. B. Sneed to J. T. Sneed, Jr., Lillian Bond Sneed also conveyed her 1/14 interest in the Moore County lands to Mrs. Thompson for the recited cash consideration of $25,000. On July 3, 1912, J. T. Sneed, Jr., conveyed his 1/7 interest in the Falls County lands to Mrs. Lillian Beal Sneed for a recited cash consideration of $11,288. On January 2, 1913, J. T. Sneed, Jr., and Mrs. Thompson by joint deed conveyed their respective 1/7 interests in the Milam County lands to H. M. Sneed for a recited cash consideration of $14,000. On August 5, 1912, Mrs. Thompson conveyed her 1/7 interest in the Falls County lands to Mrs. Lillian Beal Sneed for a recited cash consideration of $10,000. On June 3, 1913, for a recited cash consideration of $25,000, she also conveyed a 2/7 interest in the Falls County lands to Lillian Bond Sneed, which 2/7 interest had theretofore been conveyed to her by her brother, H. M. Sneed, on January 14, 1913, for a recited cash consideration of $25,000, the said H. M. Sneed having theretofore acquired a 1/7 interest in such lands from J. B. Sneed by deed dated January 3, 1913, which was in addition to the 1/7 interest H. M. Sneed took under his father's will. The last mentioned deed also conveyed to H. M. Sneed the 1/7 interest of J. B. Sneed in the Falls County lands and recited a total consideration of $25,000. The record further shows that at the time of the partition J. B. Sneed was involved in personal and financial difficulties, of an undisclosed nature, and that he sold the lands he obtained under the will and in the partition to his brother, H. M. Sneed.

From the inventory and appraisement of the estate of J. T. Sneed, Sr., it appears that J. T. Sneed, Jr., was indebted to the estate in the sum of $30,905.77, that H. M. Sneed owed it $18,281.32, and that J. B. Sneed owed the estate $1,119.06. It further appears that the estate possessed personal property of the appraised value of $57,600, most of which consisted of a half interest in 5,000 head of cattle in Moore County. The evidence does not reveal the manner in which these personal assets were adjusted by the parties in the partition, but from the testimony of J. B. Sneed the pre-

sumption arises that any inequalities in the value of the respective lands were adjusted in the apportionment of the personal estate.

In November 1912, certain ranch properties in Potter County were exchanged for certain other ranch lands in Moore County owned by R. B. Masterson so that the Moore County ranch property thereafter aggregated 77,956 acres. The exchange was made by the executrix and executors of the will of J. T. Sneed, Sr. The Masterson deeds were made to J. T. Sneed, Jr., who held the lands thus conveyed as trustee for himself, Mrs. Thompson, and James Phillip Sneed. In July 1913, a partition of the 77,-956 acres in Moore County was made between J. T. Sneed, Jr., Mrs. Thompson, and James Phillip Sneed in the District Court of Moore County. J. T. Sneed, Jr., received 55,847 acres in such partition, the court having recognized his prior half interest in the lands. It is the theory of the appellees that a 3/10 interest in this 55,847 acres is substantially the equivalent of a 3/14 interest in the 77,956 acres which they claim passed to J. T. Sneed, Jr., under his father's will. In recent years the Moore County property has become extremely valuable as a result of the production of gas by certain oil, gas, and pipe line companies who hold leases which they secured from J. T. Sneed, Jr.

J. T. Sneed, Jr., died testate and without issue on October 15, 1940. He was married three times. He first married Zella Fisher in 1913. Thereafter he duly and legally adopted her daughter by a former marriage, Elizabeth May Fisher, then nineteen years of age, as his legal heir. In 1938, his first wife having died and his second marriage having ended in a divorce, he was married to Brad Love, a widow who then had two children, Dorothy Love and Betty Love, by a former marriage. Shortly after his third marriage, J. T. Sneed, Jr., duly adopted Dorothy Love and Betty Love as his legal heirs. He left a will dated October 5, 1936, which was prior to his last marriage, in which his first adopted daughter, Mrs. Elizabeth Pool (nee Elizabeth May Fisher), was the sole devisee, subject to the terms of a trust, with provision that upon her death the estate should go to any surviving child or children of her body and to the bodily issue of any deceased child or children. By codicil dated November 16, 1938, which was subsequent to his last marriage, he left to his last wife, Mrs. Brad Love Sneed, an annual cash legacy of $15,000, and to each of her two children, whom he had adopted, a cash legacy of $15,000 when each reached twenty-five years of age.

Of the seven beneficiaries named in the will of J. T. Sneed, Sr., only three, namely, Mrs. Georgie Thompson, J. B. Sneed, and Lillian Beal Sneed, survived J. T. Sneed, Jr. Lillian Bond Sneed was never married and died without issue in 1919. She left a will in which her mother, Mrs. Lillian Beal Sneed, was the sole beneficiary. James Phillip Sneed died testate in 1922 and left his widow and one child, who were beneficiaries under his will. H. M. Sneed died testate in 1934, and left his widow and four children, one of whom has since died. The widow of H. M. Sneed, his three children, and one grandchild were the devisees under his will. Lillian Beal Sneed also died testate in 1941 after this suit was filed, in which she was an original plaintiff. The executors under her will were substituted, by amended pleadings, as parties plaintiff. Prior to the filing of this suit, J. B. Sneed transferred by deeds all of his right, title, and interest in the subject matter of this suit to his two daughters, Lenora Atwell and Georgie Beal Rose. J. B. Sneed is therefore not a party to this suit, but his daughters were made parties plaintiff and are appellees in this Court. The other appellees, who were plaintiffs below, are Mrs. Georgie Thompson and the heirs and devisees of H. M. Sneed and James Phillip Sneed. Mrs. Thompson is claiming in her own right under her father's will, and the others as successors in interest of the other original beneficiaries. The appellants in this Court, who were defendants below, are the beneficiaries under the will of J. T. Sneed, Jr. and the executors of such will.

The cause of action of the appellees is based upon the theory that J. T. Sneed, Jr. died "without issue or assigns" within the meaning of his father's will and that his 1/7 interest in his father's estate obtained under the will and still retained by him at the time of his death passed to the appellees under the above-quoted third section of his father's will. The appellees recognized the validity of the mineral leases executed by J. T. Sneed, Jr., to certain oil, gas, and pipe line companies, who are not parties to this suit, and thus no attack is made upon their interests. In so far as such leases are concerned, they are seeking recovery only for such interest as had passed to J. T. Sneed, Jr., under his father's will and held by him at the time of his death, and seek recovery

only of the royalties accruing from such interest subsequent to the death of J. T. Sneed, Jr.

The appellants defended the suit chiefly upon two theories: First, that the property in controversy passed to J. T. Sneed, Jr., in fee simple and without limitation under his father's will; and, secondly, that the beneficiaries under the will of J. T. Sneed, Jr., are "assigns" within the meaning of his father's will and thus the property passed to them under the will of J. T. Sneed, Jr. Other defenses were also urged, as will hereinafter appear.

In a trial before a jury the appellees, in keeping with their pleadings, recovered an undivided 3/10 interest in the 55,847 acres in Moore County set apart in the partition to J. T. Sneed, Jr., and, with certain exceptions as hereinafter shown, an undivided 3/10 interest in the minerals under said land subject to the terms of existing leases, including 3/10 of the value of the oil and gas produced and royalties earned since October 15, 1940, the date of the death of J. T. Sneed, Jr., and a 6/21 interest in certain lands located in Milam and Gillespie Counties. No complaint is presented that these fractional interests recovered do not represent the interest due the appellees in the event they are entitled to recover, and we shall therefore omit any further explanation of such fractions, since they thus become immaterial. Suffice it to say that the recovery represents the equivalent of all the property which passed to J. T. Sneed, Jr., under his father's will, that was held by him at the time of his death.

It is unusual that so many questions of obvious importance could arise in the trial of one lawsuit, but our labors have been greatly reduced by the apparent skill of the attorneys in presenting their respective theories in their excellent briefs.

Appellants present, as their first point, the alleged error of the court in failing to hold that J. T. Sneed, Jr., acquired a fee-simple estate without limitation in the property devised to him by his father. It is their contention that the gift-over provision in the third paragraph of the will in question was limited to the first taker's death before that of the testator and did not mean death without issue or assigns at any time, that is, subsequent to the death of the testator. Since J. T. Sneed, Jr., survived his father, appellants assert that the limitation clause therefore did not affect the interest he took under his father's will.

In Texas the general rule is that under a will of this sort, where the testator vests the first taker with the fee coupled with a defeasance based upon a contingency in favor of others, the gift over, unless controlled by other provisions of the will, takes effect upon the first taker's death at any time, whether before or after that of the testator. St. Paul's Sanitarium v. Freeman, 102 Tex. 376, 117 S.W. 425, 132 Am.St.Rep. 886; Darragh v. Barmore, Tex.Com.App. 242 S.W. 714; Federal Land Bank of Houston v. Little, 130 Tex. 173, 107 S.W.2d 374; Peden Iron & Steel Co. v. Lockett, 131 Tex. 287, 115 S.W.2d 405. Upon thorough examination and study we find nothing in the will in this case to take it out of this general rule. Appellants contend that the testator was concerned solely with what happened to his property at the time of his death, and not thereafter, and base this contention mainly upon the fact that he made several references in his will to a division of his property and also directed his executors to sell his property should it become necessary to pay his debts or make a division or partition of the property. They contend that by this language he had in mind only one partition or division of his estate, which was to take place immediately subsequent to the time of his death, and that the property then taken would immediately vest in absolute fee and without limitation in such beneficiaries.

We think there is nothing inconsistent with the division of the estate at any time and the limitation over in favor of the survivors upon the happening of the contingency expressed, that is, that the estate so taken would be defeasible upon such taker dying "without issue or assigns." No doubt, the testator contemplated a division of his estate within a reasonable time after his death and that each of the devisees would have certain property set apart to him in severalty, but this fact would not, in our opinion, affect the subsequent rights of the surviving devisees, upon the happening of the contingency, to further acquire the share thus defeated. There is no indication from the will that the testator contemplated that his son, J. T. Sneed, Jr., would predecease him. This theory is controverted by the fact that the testator appointed such son one of his executors and indicated his desire

that the Moore County ranch remain undivided "until it suits my wife, Lillian B. Sneed, and my son J. T. Sneed, Jr., not to exceed ten years, * * *." At the time of the execution of the will, J. T. Sneed, Jr., was thirty-one years of age, able-bodied, and unmarried. The testator's two younger children were also unmarried. The youngest was only eleven years old. This limitation controlled the gifts to them as well as to J. T. Sneed, Jr. The testator surely did not contemplate that they, too, would predecease him. However, we think the most potent argument against this contention of the appellants is that expressed in Peden Iron & Steel Co. v. Lockett, supra, [131 Tex. 287, 115 S.W.2d 406] in the following language: "The provision of the fourth item with reference to the interest of a child dying without issue and the reverting of the interest of such child to the testator's estate, could not, consistent with the other provisions of the will, have reference to the child's death prior to that of the testator. The child without issue predeceasing the testator could not in such event and at such time, have an interest to revert."

In view of the authorities on this question and of the terms of the will, it is our firm conviction that the limitation expressed by the testator refers to the death of the devisees at any time, and we must therefore overrule the first assignment.

The appellants next contend that the devisees named in the will of J. T. Sneed, Jr., were his "assigns" within the meaning of the third section of his father's will. No contention is made by them that the adopted daughters of J. T. Sneed, Jr., constituted "issue" within the meaning of his father's will.

Appellees concede that J. T. Sneed, Jr., was empowered under his father's will to freely assign during his lifetime all or any portion of the property received by him under his father's will; and they further concede that such assignments would have vested absolute title in his assignees. But the appellees do not concede, and strongly contest, the theory that he was authorized under his father's will to pass title to such property by testamentary devise.

The construction placed upon the word "assigns" by the appellants is based upon a broad and comprehensive definition of the word as illustrated in many authorities, for instance, in 5 C.J. 1310, as follows: "'Assigns' is said to be a term of well known signification, comprehending all those who take either immediately or remotely from or under the assignor, whether by conveyance, devise, descent, or act of law; * *." See also 5 C.J.S., Assign, p. 1034. For similar definitions see: Abbott's Law Dictionary; Vol. 4, Words and Phrases, Perm. Ed. Assigns, p. 537; Black's Law Dictionary, Third Edition; Glenn v. Caldwell, 74 Miss. 49, 20 So. 152; Brown v. Smith, 13 N.D. 580, 102 N.W. 171; Smith v. Baxter, 62 N.J.Eq. 209, 49 A. 1130; Ferrell v. Deverick, 85 W.Va. 1, 100 S.E. 850; Brown v. Crookston Agricultural Ass'n, 34 Minn. 545, 26 N.W. 907.

Under this broad construction of the word, it would not only have been difficult, but practically impossible, for J. T. Sneed, Jr., to have died without "assigns." Such construction includes every possible way by which one person could take property from another. Upon this theory, had J. T. Sneed, Jr., died intestate, his three adopted daughters and his last widow, taking from him by descent, would have become his "assigns" and would have taken the property under the will of J. T. Sneed, Sr. Under such construction the term "assigns" would not have created any more of a condition than if the contingency had been "should J. T. Sneed, Jr., die," for a man is about as certain to leave someone who will take by descent as he is to die.

In the third paragraph of the will in question the testator first directed an equal division of all of his estate, share and share alike, between the seven named beneficiaries, "their heirs or assigns." Had the testator stopped at this point in the will, the seven named devisees would have become vested, upon his death, with the absolute fee-simple title. Article 1291, Vernon's Ann.Civ.St.; McMurray v. Stanley, 69 Tex. 227, 6 S.W. 412; Laborde v. First State Bank & Trust Co. of Rio Grande City, Tex.Civ.App., 101 S.W.2d 389, writ refused; Frame v. Whitaker, 120 Tex. 53, 36 S.W.2d 149; Johnson v. Morton, 28 Tex.Civ.App. 296, 67 S.W. 790, writ refused; Kendall v. Clapp, 163 Mass. 69, 39 N.E. 773; Williamson v. Cowan, Tex.Civ.App., 265 S.W. 745, writ refused. However, the testator saw fit to place specified conditions of defeasance on what otherwise would have been an estate in absolute fee and without limitation. Although the term "heirs and assigns" was unnecessary to indicate an absolute fee as used in the bestowing clause, the similar

words used in the gift-over clause become important because they restrict an estate which otherwise would have been absolute. Had the testator used only the term "without issue," it is settled that the devisees would have taken the fee-simple title to the property with power to assign the same, but the alienation made by them would have been subject to defeat should the particular assigning heir subsequently have died without issue. Lockridge v. McCommon, 90 Tex. 234, 38 S.W. 33; Hull v. Calvert, 286 Mo. 163, 226 S.W. 553. J. T. Sneed, Jr., having died without issue, the use of the word "assigns" in the will of his father becomes extremely important, for without such term any assignments of the property made by the son during his lifetime would have been defeated at the time of his death. The question therefore becomes pertinent: What did the testator mean by "assigns"? This being a limitation clause, he certainly meant something by the use of this word, but we think we must reject the comprehensive definition relied upon by appellants; otherwise, the term would be without meaning. In our opinion, there is only one reasonable interpretation to be placed upon the term and that is that the testator was thinking of assignments made during the lifetime of the beneficiaries and not of testamentary dispositions under a will, which, of course, would not become effective until after the death of such beneficiaries. The testator stated that the property would go over in the event any of the named heirs should die without assigns, or, to use his exact language, "in case any of the above-named persons and heirs should *die* without issue or *assigns,*" then his portion of the estate would go over as directed in the will. (Italics are ours.) He was thus speaking of the status of the property at the exact time of the death of the devisees and did not, in our judgment, intend to use the term so broadly as to include executors and devisees of the beneficiary, who could only become assignees, if at all, after the death of the first taker.

■ In Hight v. Sackett, 34 N.Y. 447, 451, on the admissibility of certain testimony, it became necessary for the court to determine whether a legatee was an assignee within the meaning of a New York statute. The Court said: "An assignment can in no just sense be said to be made by a dead man, nor can it properly be said that one who receives a legacy takes as assignee. The instrument is without life until the death of the giver, and nothing is received by the beneficiary until the giver has ceased to possess the power to bestow. The two parties do not co-exist for an instant. The idea of an assignment is essentially that of a transfer, by one existing party to another existing party, of some species of property or valuable interest."

In Miller v. Worrall, 59 N.J.Eq. 134, 44 A. 890, it is said: "By the sixth clause of his will, testator provides that if 'a sale, assignment, or pledge' be made by any of his children of their interest, it shall work a forfeiture thereof. It is plain that the making of a will by Mrs. Riggs, which took effect only after death, is not an 'assignment' of her share, within the meaning of this clause. The testator is here using technical words, which, in a provision of this sort, must receive their technical meaning. 'The idea of an assignment is essentially that of transfer by one existing party to another existing party.' Hight v. Sackett, 34 N.Y. 447."

In Ripley v. Seligman, 88 Mich. 177, 50 N.W. 143, 145, in passing upon the admissibility of testimony involving the status of an assignee, the Court said: "The word 'assigns' is used here in its legal sense, and signifies a person to whom any property or right is transferred by a deceased person in his life-time."

■ Our interpretation of the intention of the testator is not without some authority in Texas. Although we have been unable to find a case squarely in point in this, or in any other, jurisdiction, we think the case of Sherman v. Goodson's Heirs, Tex. Civ.App., 219 S.W. 839, 840, 842, is persuasive. It is, at least, authority for the general proposition that the power of the first taker under a will to assign during his lifetime does not invest the first taker with the further authority to dispose of the property by will *contrary to the intentions of the first testator.* In the Sherman case a joint will was made by two sisters, providing that all of the property belonging to the one who should die first should pass to the survivor and at the survivor's death should pass to certain others. The will further provided that the survivor or first taker should have free use of the property so taken under the joint will "without any restrictions of any character whatever, with full power to sell and dispose of any and all of said property as she may see proper." The survivor under such joint will attempted to dispose of such

property so taken by a second will contrary to the terms of the joint will. In refusing to uphold the latter testamentary attempt, the Court said: "It is further contended that under the terms of the will itself Sue E. Goodson had the power to dispose of all the property during her lifetime, and that this included the power to dispose of it by her will. Such a construction would be in direct conflict with the language of the will. That instrument expressly provides and directs how the property that remains after the death of both shall be disposed of. That provision is wholly inconsistent with a purpose to endow the survivor with power to make a different disposition."

■ Such a testamentary disposition of property in fee with limitation over in favor of others at the death of the first taker is not uncommon in Texas and has been approved by our courts in many instances, among which are the following authorities: McMurray v. Stanley, 69 Tex. 227, 6 S.W. 412; Adams v. Williams, 112 Tex. 469, 248 S.W. 673; Littler v. Dielmann, 48 Tex.Civ.App. 392, 106 S.W. 1137, writ refused; West v. Glisson, Tex.Civ. App., 184 S.W. 1042, writ refused; Feegles v. Slaughter, Tex.Civ.App. 182 S.W. 10, writ refused; Lockridge v. McCommon, 90 Tex. 234, 38 S.W. 33; Norton v. Smith, Tex.Civ.App., 227 S.W. 542.

■ After thorough deliberation we have reached the conclusion that the intention of the testator in this case, like the desires of the testators in the cases cited, where the same thought was expressed in different language, was that his devisees should freely enjoy and possess such property in fee while they lived, with power of alienation during such time, conditioned that should any one of them die without issue, as J. T. Sneed, Jr., did, such property as was not disposed of at the time of his death should pass to the survivors named; but that such free right to assign during the lifetime of such heir did not authorize such heir without issue to defeat the condition by attempting to dispose of the property by will. Had the testator possessed the intention accredited to him by the appellants, he might well have broadened the condition so as to include the power to make disposition by will as well as by assignment, as was the case in Lockridge v. McCommon, supra, but, for reasons satisfactory to himself, he did not see fit to include such authority. In our opinion, the term "assigns" did not, even by implication, include a testamentary disposition, which takes effect only after the death of a testator and is subject to change or revocation during his lifetime. Ely v. Moore, Tex.Civ.App., 297 S.W. 795, reformed and affirmed Tex.Com.App., 11 S. W.2d 294.

Appellants further complain of the recovery allowed the appellees in the oil and gas royalty interests in the lands in controversy under the leases recognized as valid. Appellants claim that under the respective leases all such minerals, including oil and gas, were conveyed to the lessees and constituted an assignment by J. T. Sneed, Jr., within the meaning of his father's will, of the entire mineral estate and that all royalty interests and the benefits arising therefrom subsequent to the death of J. T. Sneed, Jr., including any payments to be made out of oil and gas, should pass to appellants under the respective wills of J. T. Sneed, Sr., and J. T. Sneed, Jr. Appellants are thus contending that, within the meaning of his father's will, J. T. Sneed, Jr., assigned the entire mineral estate in the lands described in the leases, that the lessees named in each of such instruments were his "assigns," and that J. T. Sneed, Jr., thereby acquired an indefeasible interest in the royalty and all other considerations to be paid by his "assigns." On the contrary, the appellees assert that all of the royalty interests and benefits arising from said leases, including delay rentals, are interests in lands which were not assigned by J. T. Sneed, Jr. within the meaning of his father's will and which follow the fee of the surface of the land, and as such should be recovered by them as a part of the estate undisposed of by J. T. Sneed, Jr., at the time of his death. The trial court sustained the contention of the appellees and, with certain tracts excepted, allowed them a recovery of an undivided 3/10 interest in all the oil, gas, and other minerals in the Moore County lands, subject to the oil, gas, and mineral leases existing upon such lands, and an undivided 3/10 interest in the oil, gas, and mineral royalties, rents, and payments out of oil and gas accruing from such mineral leases since October 15, 1940, the date of the death of J. T. Sneed, Jr., together with such interest in future payments. The tracts excepted were lands in which J. T. Sneed, Jr., owned only one half of the minerals at the time of his death. In such lands the recovery was limited to 3/10 of

1/2 of the oil, gas, and other minerals, subject to the leases, and a corresponding limitation in respect to royalties, rents, and payments.

In our opinion, there is nothing in this case to take it out of the rule expressed in the case of Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021, 1024. The leases in controversy, providing for royalty payments in money, clearly showed that such payments were from production or based thereon.

In Sheffield v. Hogg, supra, the Supreme Court, speaking through Justice Greenwood, said: "It logically can make no difference, * * * whether the oil is retained by the lessor as oil and gas, readily convertible into cash on the market, or whether the lessee is given a power to sell all of the oil and gas, always accounting for a fixed royalty portion to the lessor. Sound principle, supported by the highest authority, goes further and compels us to accede to the proposition that dealing with oil and gas or dealing with solids in place, * * * the lessor owning the entire fee-simple title to the land, and his assigns, who have been careful to secure to themselves, their heirs or assigns * * * the right to a portion of the proceeds or profits derived from the lessee's or his assigns' authorized sale of the minerals, throughout the duration of a determinable fee, which may be perpetual, have and own a fee-simple interest in land, or at least have a right belonging or appertaining to the horizontal strata of the land in which the minerals are embedded."

In epitomizing the holding in Sheffield v. Hogg, Judge Smedley, speaking for the Court in Tennant v. Dunn, 130 Tex. 285, 110 S.W.2d 53, 57, said: "The gist of the opinion in Sheffield v. Hogg is that oil and gas royalties, whether payable in kind or in money, and whether arising from the ordinary lease of land in which the lessor owns the minerals, or from a lease made under the Relinquishment Act, should be adjudged to be present interests in land rather than mere rights in personalty at some uncertain date, because they are profits arising out of land, and, further, because such classification, which accords with the practice in the oil and gas industry, furnishes a stability highly important, if not essential, to the structure of that business."

Under these authorities, we think the royalty interests herein involved, which were held by J. T. Sneed, Jr., at the time of his death, constituted "interests in land" received by him under his father's will and, as such, became subject to the conditional limitation of the will, and the trial court was correct in so holding. Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472; Sheppard v. Stanolind Oil & Gas Co., Tex.Civ. App., 125 S.W.2d 643, writ refused; Young v. Poling, Tex.Civ.App., 154 S.W.2d 686, writ refused.

As above stated, J. T. Sneed, Jr., acquired a 2/14 interest in the Moore County property from the other devisees in the partition. In making such partition, eleven deeds were exchanged between the beneficiaries, as above shown. By several assignments, the appellants contend that the court erred in not holding that the deed from J. B. Sneed, dated June 9, 1913, conveying a 1/7 interest in the Moore County lands to J. T. Sneed, Jr., vested an absolute title to such land in the grantee, and that the court erroneously permitted the appellees to show the intention of the participating brothers and the object and purpose of the deeds. Incidentally, the jury found that the three brothers, H. M. Sneed, J. B. Sneed, and J. T. Sneed, Jr., agreed to divide their interests in the estate whereby H. M. Sneed and J. B. Sneed would exchange their interests in the Moore County lands for the interest of J. T. Sneed, Jr., in the Falls and Milam Counties properties; that the deed executed by H. M. Sneed, dated January 2, 1913, and the deed executed by J. B. Sneed, dated June 9, 1913, were executed in pursuance of such agreement; and that J. T. Sneed, Jr., did not, on June 9, 1913, by deed of that date, purchase from J. B. Sneed a 1/7 interest in the Moore County lands for a consideration of $50,000. Notwithstanding such jury findings, which were amply supported by the evidence, the appellants assert that the deed in question from J. B. Sneed to J. T. Sneed, Jr., vested an absolute title in the grantee because of a clause it contained as follows: "It is the purpose and intention of the grantor herein to convey to the grantee all lands or interest in lands owned or possessed by grantor and located in said Moore County, Texas, as the boundaries of said Moore county are now established, whatsoever the nature of such ownership or interest, and from whatsoever source derived."

The appellants assert that the above-quoted clause of the deed, purportedly conveying every interest "owned or possessed"

by J. B. Sneed, "whatsoever the nature of such ownership or interest, and from whatsoever source derived," included any contingent remainder or contingent interest in the lands in question to which J. B. Sneed was entitled under his father's will.

We think it is established by the evidence and the jury findings that the deed in question was merely one of the partition deeds which passed between the parties during the period of about one year following the oral partition agreement of July 2, 1912. The jury found upon sufficient evidence that the transaction evidenced by the deed was not a purchase of J. B. Sneed's interest for a consideration of $50,000. The valuation of $50,000 was shown to have been based upon the appraised value of the Moore County lands. The same or similar values were placed upon other shares, as is evidenced by the deeds above described. The testimony shows that these considerations expressed in the partition deeds were not actually paid. Two of the other partition deeds contained exactly the same clause as that quoted from the deed executed by J. B. Sneed. Clauses of similar import were also contained in some of the other deeds, such as that contained in the deed from J. T. Sneed, Jr., to Mrs. Lillian Beal Sneed, dated July 3, 1912, conveying his interest in the Falls County lands and reciting that the "above lands herein mentioned being an undivided one-seventh interest in property devised to me, by my deceased father * * * and as such heir, it is the purpose of this instrument to only convey my entire undivided 1/7 interest in and to the above-described property * * *."

The deed in question, from J. B. Sneed to J. T. Sneed, Jr., first refers to "all my undivided interest in and to about 75,424 acres of land located in Moore County in the State of Texas, and owned by the estate of J. T. Sneed, Jr." (Sr.) This interest included the 1/14 interest which J. B. Sneed had theretofore acquired from his brother, H. M. Sneed, in accordance with the partition agreement of July 2, 1912. Then followed the additional provision: "* * * my interest therein being an undivided one-seventh interest and for a more particular description of said lands reference is hereby made to the deeds of conveyance of record in said Moore County,. Texas, conveying said lands to J. T. Sneed and J. T. Sneed, Jr., or either of them or to the estate of J. T. Sneed, deceased and to all evidences of title of record in said Moore County, Texas, pertaining to said lands."

Thereafter follows the clause first above quoted which refers to "lands or interest in lands *owned* or *possessed* by grantor * * *." (Italics are ours.) No reference was therein expressly made to any future ownership, interest, or possession or to a future unvested expectancy, nor did the grantor use any language expressly vesting title in absolute fee freed from all conditions and limitations under his father's will. It is therefore reasonable to assume, we think, that this language and the succeeding provision, "whatsoever the nature of such ownership or interest, and from whatsoever source derived," referred to lands or interest in lands then possessed by the grantor. It should be noted that at the date of this deed the status of the contingent interest "owned" by J. B. Sneed was of a very complex nature, dependent upon the construction of a will containing a conditional limitation, the meaning of which is still not finally determined. 21 C.J. 984, 995; 31 C.J.S., Estates, § 72. It must be conceded that such interest could have been entirely defeated if J. T. Sneed, Jr., had had "issue" or had "assigned" the property within the meaning of his father's will. Under all of these circumstances, we think that under appellees' allegations it was permissible to introduce parol evidence to determine the real intention of the parties.

In 14 Tex.Jur. 1048, Sec. 253, the following statement is made: "Wide latitude is permitted in the introduction of evidence of the intention of the parties as to the land conveyed, parol evidence being always admissible where it is merely explanatory and designed to remove a latent ambiguity."

From Turner v. Montgomery, Tex.Com. App., 293 S.W. 815, we quote: "The initial statement by the Court of Civil Appeals that, 'in the construction of instruments, the entire instrument, together with the surrounding circumstances, should be looked to, and, if it is ambiguous, parol evidence may be offered to enable the court to determine the real intention of the parties,' is an accurate statement of the general rule of interpretation. Through all the rules governing construction of instruments, there runs the central thought of ascertaining the real intention of the parties."

In 32 Tex.Jur. 146, 147, Sec. 2, on the effects of a partition, it is said:

"While a partitioning of property vests in each of the parties thereto the full and exclusive ownership of the particular tract which has been set aside or allotted to him, the transaction is deemed not to operate as a conveyance or transfer of title. 'The partition is of the possession, and not of the title.' The result is to vest the 'equitable title' of the respective shares in the several owners to whom allotments are made, 'the legal title remaining as before.' * * *.

"Inasmuch as a partition by agreement has not the characteristics of a conveyance, it cannot be held to pass an after-acquired title."

In Chace v. Gregg, 88 Tex. 552, 32 S.W. 520, 522, on the same subject it is stated: "A partition between joint owners does not confer title upon either, but has the effect only to dissolve the tenancy in common, and leave the title as it was before, except to locate such rights as the parties may have, respectively, in the distinct parts of the premises, and to extinguish such rights in all other portions of that property."

 Therefore, under the evidence and findings of the jury, by which we are bound, we must conclude that the deed in question was not one of settlement of a contingent future interest, but merely one of partition which did not invest J. T. Sneed, Jr. with any new title. Jones v. State, Tex.Com.App., 5 S.W.2d 973; Walling v. Harendt, Tex.Civ.App., 37 S.W.2d 280; First Nat. Bank of Brownwood v. Hickman, Tex.Civ.App., 89 S.W.2d 838; Craig v. McFadden, Tex.Civ.App.; 191 S. W. 203, writ refused; First Nat. Bank in Graham, Tex. v. Mabry, Tex.Civ.App., 126 S.W.2d 59; Smith v. Texas & N. O. R. Co., 101 Tex. 405, 108, S.W. 819; Kinard v. Eubank, Tex.Civ.App., 292 S.W. 633; 21 C.J. 984, § 137; 31 C.J.S., Estates, § 72.

Appellants next present the question as to whether the statute of limitations of twenty-five years, as pleaded by them, was a bar to appellees' cause of action to recover the interests in the Moore County lands, which, they assert, were held by J. T. Sneed, Jr., from the date of the deed of June 9, 1913, from J. B. Sneed, until the time of the death of J. T. Sneed, Jr., on October 15, 1940, a period of more than twenty-five years. Article 5519, Vernon's Ann.Civ.St. They also assert in this connection that the

court erred in not submitting an issue to the jury predicated on this statute. In support of these contentions, the appellants rely chiefly on the case of Howth v. Farrar, 94 F.2d 654, in which there was a dissenting opinion by Judge Holmes. In that case the Circuit Court of Appeals for the Fifth Circuit interpreted the statute in question as not being limited to the accrual of the cause of action. That court apparently based its opinion upon the absence of any reference to the accrual of the cause of action in the statute in question, whereas the three-, five-, and ten-year statutes of limitation contain such references. Articles 5507, 5509, and 5510, Vernon's Ann.Civ.St.

There was no testimony that the possession of J. T. Sneed, Jr., was hostile in any manner, if it could have been, to the contingent interests provided in the limitation clause of the will of J. T. Sneed, Sr., nor was there any suggestion of any repudiation of such contingent interests. So long as J. T. Sneed, Jr., lived, appellees had no title, no possession, and no right of action of any sort for title or possession. Their contingent interests were subject to defeat until the very time of the death of J. T. Sneed, Jr. They could have been defeated by J. T. Sneed, Jr., having had issue or having assigned the property during his lifetime. Under these circumstances, we are unable to conceive of any kind of a cause of action that could have been asserted by the appellees. We think that to compel a person to file a suit to avoid limitations before the arising of some sort of a cause of action for title or possession would be an anomaly heretofore unknown to Texas procedure.

 In Evans v. Graves, Tex.Civ.App., 166 S.W.2d 955, where there was also a dissenting opinion by Justice Bond who found himself in accord with the holding in Howth v. Farrar, the Dallas Court of Civil Appeals had before it the question as to when the cause of action accrued to a remainderman in a case where the statutes of limitation of five, ten, and twenty-five years were involved. Such court held that it accrued with the vesting of the estate with the remainderman. The majority opinion in that case was expressly in accord with the dissenting opinion of Judge Holmes in Howth v. Farrar, supra. The Supreme Court of Texas refused for want of merit an application for writ of error in Evans v. Graves, supra. That case, therefore, is authoritative that the same

rule applies to the twenty-five-year statute as it does to the three-, five-, and ten-year statutes.

■ Although in Warnecke v. Broad, 138 Tex. 631, 161 S.W.2d 453, 454, the Supreme Court had under consideration only the ten-year statute of limitations, the following general statement as to such statutes was made by Justice Sharp who wrote the opinion: "The rule has long prevailed in this State that statutes of limitation only begin to run from the time that the right of action accrues."

■ We can conceive of no good reason why this general rule should not apply to the twenty-five-year statute as well as to all others. It is elementary, we think, that statutes of limitation generally, as applicable to an interest in land which one owns as a remainderman subject to the life estate in another, do not begin to run in favor of one in possession, or of any persons not strangers to the life estate, until the death of the life tenant. Olsen v. Grelle, Tex.Com.App., 228 S.W. 927; Rae v. Baker, Tex.Civ.App., 38 S.W.2d 366, writ refused; Hensley v. Conway, Tex.Civ. App., 29 S.W.2d 416, and authorities cited. This rule, in our judgment, must be applied to the facts of this case, and we thus conclude that the statute of limitation of twenty-five years has no application here and that no facts existed to raise an issue thereon. Rio Bravo Oil Co. v. McEntire, 128 Tex. 124, 95 S.W.2d 381; Cleaver v. Knighton, Tex.Civ.App., 127 S.W.2d 958; West v. Hapgood, Tex.Civ.App., 169 S.W. 2d 204, writ granted; 28 Tex.Jur. 138, Sec. 55; 2 Tex.Jur. 28, Sec. 11.

Appellants further assert that the court erred in failing to hold that a certain witness was disqualified to testify in this case because of his prior conviction of a felony in a Federal Court, and that the court also erred in not permitting the record of such conviction to be introduced in evidence as affecting the credibilty of such witness.

It appears that on October 7, 1922, the witness was convicted of a felony in the United States District Court for the Northern District of Texas and sentenced to serve two years in the Federal penitentiary at Leavenworth, Kansas, which sentence he served. He was convicted upon two counts, namely, conspiracy to corruptly influence, obstruct, and impede the due administration of justice, and of corruptly influencing, obstructing, and impeding the due admin-

istration of justice in a court of the United States.

In connection with this assignment the appellants insist that the amendment of 1925 to Article 3717, Vernon's Ann. Civ. St., providing against disqualification of a witness in civil cases because of a prior conviction of a felony, did not remove the disqualification of this witness convicted in 1922, for the reason that the disqualification was a part of his punishment. They rely upon the case of Underwood v. State, 111 Tex.Cr.R. 124, 12 S.W.2d 206, 63 A.L.R. 978, as authority for such contention. In that case the Court of Criminal Appeals had under consideration the question as to whether an amendment to Article 708, Vernon's Ann. C.C.P., permitting certain convicts to testify in criminal cases, applied to those convicted prior to the passage of the amendment. It was held that because Article 4, Sec. 11 of the Constitution, Vernon's Ann.St., expressly confided the pardoning power to the governor, the legislature was without authority to remove the disqualification of those whose final convictions occurred prior to the passage of the amendment. Such holding was predicated upon the same theory expressed in State v. Grant, 79 Mo. 113, 124, 49 Am. Rep. 218, 222, wherein it is said: "* * * when the statutes annex certain disabilities, the loss of certain civil rights, to the conviction of a crime, and a conviction of that crime thereafter occurs, that thereupon by force and operation of the law and of the judgment of conviction the disabilities become welded to the crime, forming, thereby an indivisible integer incapable of separation by any exertion of legislative power." We make no criticism of the holding in the Underwood case as applied to the trial of criminal cases, but we think the quotation from the Grant case points out the reason why the rule expressed there and in the Underwood case has no application to the facts of the instant case. The disqualification must have become fixed as a part of the crime. In Texas there has never been any statutory law excluding the testimony of such a witness in a civil case. It was only in criminal cases that it was ever excluded by statute. It is true that prior to 1925 such testimony was also excluded in civil cases, but such procedure was derived from the common law and not by statute. 44 Tex.Jur. 1039, Sec. 78.

■ Article 3 of Vernon's Ann.P.C. provides: "In order that the system of

penal law in force in this State may be complete within itself, and that no system of foreign laws, written or unwritten, may be appealed to, it is declared that no person shall be punished for any act or omission, unless the same is made a penal offense, and a penalty is affixed thereto by the written law of this State." This statute very clearly evidenced the intention of the lawmakers that no person should suffer penalties for any wrongs in this State except those expressly designated by written statute, thus prohibiting punishment for crimes known to the common law but unknown to our statutory law. Since there has never been any statutory law prohibiting the witness in question from testifying in a civil case, his disqualification to do so prior to 1925 was not, in our judgment, a part of his punishment, and the legislature was therefore not without authority in 1925 to restore his competency thereafter to testify in civil cases.

There is also respectable authority for the proposition that State and Federal Courts sitting in the same State are foreign to each other and that a conviction in one of them does not render a convicted person incompetent to testify in the other, such courts being of entirely different sovereignties; however, due to our conclusions above stated, it is unnecessary for us to decide this point. Brown v. United States, 6 Cir., 233 F. 353, L.R.A.1917A, 1133; Fidelity Phenix Fire Ins. Co. of New York v. Murphy, 231 Ala. 680, 166 So. 604; Chapman v. United States, 5 Cir., 10 F.2d 124; Missouri, K. & T. Ry. Co. of Texas v. De Bord, 21 Tex.Civ.App. 691, 53 S.W. 587, writ refused; Goldstein v. State, 75 Tex.Cr.R. 390, 171 S.W. 709.

■■■ We are also of the opinion that there was no error in the court's refusal to admit testimony before the jury of the indictment, conviction, and sentence of the witness. This testimony was excluded because of its remoteness, some twenty years having intervened between the conviction of the witness and the trial of this case. During such twenty-year period, the witness was shown to have lived an exemplary life, there being no testimony to the contrary. Under such circumstances, we think there was no error in the court's action in rejecting the record of the conviction. Bernard's, Inc., v. Austin, Tex.Civ.App., 300 S.W. 256, writ refused; Vick v. State, 71 Tex.Cr.R. 50, 159 S.W. 50; Lott v. State, 123 Tex.Cr.R. 591, 60 S.W.2d 223;

Miller v. Brand, Tex.Civ.App., 32 S.W.2d 874; Texas Motor Coaches, Inc., v. Palmer, Tex.Civ.App., 97 S.W.2d 253, reversed on other grounds, 132 Tex. 77, 121 S.W.2d 323.

Appellants assign as error the court's failure to hold inadmissible the testimony of J. B. Sneed as to his transactions and conversations with J. T. Sneed, Jr., upon the theory that such evidence was in violation of the provisions of Article 3716, Vernon's Ann.Civ.St., relative to testimony as to transactions with deceased persons.

■■■ Prior to the institution of this suit, as above stated, J. B. Sneed transferred to his two daughters all his right, title, and interest in and to the subject matter of this suit. The deeds of transfer were without warranty. J. B. Sneed was not a party to this suit and testified that he had no claim or financial interest in the recovery. He further testified that the assignments to his daughters were made upon the recommendation of his attorney who informed him that, in his opinion, some future question might be raised concerning his daughters' right to recover under their grandfather's will should he (the witness) die without first assigning the property to them. His testimony in this respect was corroborated by his attorney. In refusing to strike the testimony of J. B. Sneed in this particular, the court stated that his "attitude at this time is that the bona fides of the assignments, under the state of the records at the present time, would be a question of fact for the jury—and therefore—defendants' motion is overruled." No issue was submitted nor in any manner requested in this connection. Therefore, under the evidence, the issue, if any, as to the bona fides of the assignments must be resolved in favor of the judgment. Wichita Falls & Oklahoma R. Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79. Under the record presented, the witness had no actual pecuniary interest in the suit and would not be directly affected by its results and, therefore, his testimony did not come within the prohibition of the statute. In Oury v. Saunders, 77 Tex. 278, 13 S.W. 1030, 1032, the Supreme Court had under consideration the admissibility of the testimony of a nominal party to the suit who had, pending the suit, conveyed his interest in the property in controversy to the plaintiff without warranty. In holding his testimony competent, the Supreme Court said: "We think the testimony should have been

heard. * * * Gordon and·wife had, pending the suit, conveyed all interest they had in the land to plaintiffs, which fact was afterwards set up by amendment of the petition, and the witness testified that he and his wife had no interest in the result of the suit. The transfer to plaintiffs was not of such character as would make the witness or his wife liable over to plaintiffs if they lost the suit. We see no reason for holding the witness incompetent." There are many other authorities of similar import, among which are the following: Buckley v. Runge, Tex.Civ.App., 136 S.W. 533, writ refused; Albritton v. Commerce Farm Credit Co., Tex.Civ.App., 9 S.W.2d 193, affirmed Tex.Com.App., 17 S.W.2d 784; Stevens v. Masterson's Heirs, 90 Tex. 417, 39 S.W. 292; Davidson v. Gray, Tex. Civ.App., 97 S.W.2d 488; Humble Oil & Refining Co. v. Jeffrey, Tex.Civ.App., 38 S.W.2d 374, affirmed Tex.Com.App., 55 S.W.2d 521; Mayfield v. Robinson, 22 Tex. Civ.App. 385, 55 S.W. 399, writ refused; Combs v. Howard, Tex.Civ.App., 131 S.W. 2d 206.

The trial court refused to permit appellants to introduce in evidence undated items appearing in a small, red, undated memorandum book, such items being in the handwriting of J. T. Sneed, Jr. The items rejected contained a notation that J. B. Sneed's interest in the Moore County lands was $55,680, and, after listing some debts, noted that J. T. Sneed, Jr., had paid J. B. Sneed $50,000 by note. This testimony was apparently offered to support appellants' theory that a cash consideration of $50,000 actually passed from J. T. Sneed, Jr., to J. B. Sneed under the deed of June 9, 1913. The court's action in rejecting this testimony is assigned as error.

The appellants' witness, Ray de Boice, who had continuously kept the books of J. T. Sneed, Jr., from about 1929 until the latter's death, testified that he found three ledgers and the small red book in a safe in the Sneed home in Amarillo a few days after Sneed's death. He stated that all of the items in the little red book were not in the handwriting of J. T. Sneed, Jr. He had neither seen nor heard of the red book or the ledgers before that time. In fact, all of appellants' witnesses who testified concerning them denied having any knowledge of them before Sneed's death. There was no testimony to show when or under what circumstances the entries in question were made in the red book. D. L.

Shelton, an accountant who had been doing income tax work for J. T. Sneed, Jr., for many years, claimed to have had no knowledge of the little red book until about a year after Sneed's death. There were no dates in the book except one or two in reference to other matters having no relation to the items rejected. Shelton did not know when any of the entries were made in the red book and admitted that some of the items were not original entries but were copied from other books. We think it is obvious that these excluded items were self-serving, private memoranda of doubtful origin and accuracy, and therefore, under numerous authorities, were inadmissible. 17 Tex.Jur. 753, Sec. 329; Cole v. Dial, 8 Tex. 347; Missouri Pac. R. Co. v. Johnson, Tex., 7 S.W. 838; Kotwitz v. Wright, 37 Tex. 82; Stark v. Burkitt, 103 Tex. 437, 129 S.W. 343; Scruggs v. E. L. Woodley Lumber Co., Tex.Civ.App., 179 S.W. 897; Luttrell v. Parry, 61 Tex.Civ. App. 508, 129 S.W. 865; Fite v. First Nat. Bank of Seymour, Tex.Civ.App., 279 S.W. 581.

What we have said disposes of what we think are the controlling issues in this case. The other matters urged by the appellants are overruled without discussion. Finding no reversible error in the record, the judgment will be affirmed.